Joyce A. **HICKS**, Plaintiff–Appellant,

v.

**SOVRAN BANK/CHATTANOOGA,**
Defendant–Appellant.

Court of Appeals of Tennessee,
Eastern Section.

Feb. 13, 1991.

Application for Permission to Appeal
Denied by Supreme Court
June 10, 1991.

David B. Kesler and Harry R. Cash, Chattanooga, for plaintiff.

Gary R. Patrick and Ray L. Brock, Jr., Chattanooga, for defendant.

## OPINION

GODDARD, Judge.

In this case Joyce A. Hicks sued Sovran Bank/Chattanooga, successor to Commerce Union Bank, for converting two certificates of deposits owned by her to pay an indebtedness of Hicks & Associates, Inc., an insurance concern owned by her husband, Richard Hicks. The Bank contended that a guaranty signed by Mrs. Hicks authorized its action.

After the jury responded to seven special interrogatories the Trial Judge entered judgment in favor of Mrs. Hicks in the amount of $43,826.68, which included pre-judgment interest. He also dismissed the counter complaint of the Bank seeking to set aside a number of transfers by Mr. Hicks to his wife, which the Bank contended were fraudulent.

Upon the Bank's post-trial motion the Trial Court in the original action entered a judgment *non obstante veredicto* in favor of the Bank but declined to disturb the portion of the judgment which dismissed the Bank's counter-complaint.

Mrs. Hicks appeals, contending the Trial Court was in error in granting the Bank's post-judgment motion. She maintains that the Bank had waived its right to insist upon the guaranty, that the Bank accepted a later guaranty from Mr. Hicks in lieu of one from her, and that the original judgment should be reinstated.

The Bank appeals contending it should also have been granted a judgment notwithstanding the verdict as to its counterclaim and, alternatively, that the Trial Court was in error in not granting its motion for a new trial as a thirteenth juror.

Sometime prior to August 3, 1977, Mr. Hicks established Hicks & Associates, Inc., and on that date obtained a $40,000 line of

credit, increased in 1983 to $50,000, for the corporation from the Bank. The Bank required both Mr. and Mrs. Hicks and four of Mr. Hicks' associates in the corporation to sign suretyship agreements. Mr. Hicks signed a number of such agreements over the years, the last of which was dated August 1, 1984. Mrs. Hicks signed two agreements, the first dated August 3, 1977, and the second June 10, 1980. As pertinent to this appeal the suretyship agreements provided the following:

This suretyship shall be a continuing, absolute and unconditional guaranty, and shall apply to and cover all loans, discounts or renewals thereof made by the Bank to the Debtor and any and all indebtedness, of any nature and howsoever arising or created or evidenced, owing to said Bank by said Debtor, and shall remain in full force and effect until written notice mailed certified mail, return receipt requested, of its discontinuance, addressed to the President of said Bank, shall be actually received by said Bank ([1] the burden of proof of receipt by said Bank of such notice being in all cases upon the undersigned, and also until any and all of said indebtedness, or any extensions or renewals thereof, existing before receipt of such notice, and expenses in connection therewith, shall be fully paid.

Prior to any money being advanced on the line of credit, three of the associates who had signed suretyship agreements asked to be released by the Bank, and by letter dated July 15, 1981, which the Bank professes not to have received, although an enclosure with the letter was in the Bank's file, Mr. Hicks advised an official of the Bank the following:

I am enclosing the completed Suretyship Agreements you requested and after talking with Larry Putnam, he said you agreed to not having Joyce sign the agreements.

We appreciate your interest and help and we look forward to a long and profitable relationship.

Beginning in 1977, Mr. Hicks began transferring to his wife his interest in various jointly-owned properties, both personal and real. The majority of the transfers were made by 1979 and all by 1981. The transfers were without consideration and encompassed all the assets in which Mr. Hicks owned an interest except Hicks & Associates and Citizens Bank of Dunlap which, according to Mr. Hicks, had a market value of $2400 in September 1984. The total value of the assets received by Mrs. Hicks was approximately $400,000.

Hicks & Associates began experiencing financial problems, and first drew on its line of credit on January 11, 1985, obtaining $25,000. Hicks & Associates made additional draws on April 1 and 2, 1987, raising the principal amount owed to $50,000.

The financial health of the corporation did not improve. In May 1988, the corporation filed for Chapter 7 Bankruptcy and sometime thereafter Mr. Hicks took similar action.

The following colloquy occurred between the jury foreman and the Court as the jury was responding to the special interrogatories propounded:

Number one, when Mr. Hicks transferred his home, car, lots, et cetera, did it leave him insolvent? Twelve of you said no, it did not. Does everyone agree to that?

Two, did Sovran Bank release or waive its right to rely on Mrs. Hicks' suretyship agreement? Ten of you said yes, they did waive it and two said no,[2] they did not. Is that correct?

Number four, did Mr. Hicks transfer all his assets to his wife without any consideration? You all put yes. Twelve yes's [sic], right?

Did Mr. Hicks believe he was going to incur debts beyond his ability to pay them when he transferred all his assets

---

**1.** There is not a closing parenthesis in the original.

**2.** The parties agreed that the findings of nine jurors would constitute a verdict as to the interrogatories submitted.

real and personal to Mrs. Hicks? Two of you said yes, he did and ten of you said no. Is that the way everybody remembers it?

Was Sovran Bank prejudiced or harmed by the transfer by Mr. Hicks of all his assets? Twelve of you said no, he was not—the bank was not. Does everybody agree?

Then number seven, did Sovran Bank know or should have known of Mr. Hicks' transfer of all his assets prior to November the 9th, '82? All of you said yes. Is that how everybody remembers it? Anybody disagree?

Would you let the record show that everyone agrees with these.

MR. KESLER: Number three, Your Honor.

THE COURT: Did I skip it? I'm sorry. Did Mr. Hicks transfer all his assets real and personal to his wife with the actual intent to defeat future creditors? One said yes and eleven said no.

Mrs. Hicks' brief correctly points out that the standard of review as to the propriety of the Trial Court's granting a judgment for the Defendant n.o.v. is the same standard used in determining whether a directed verdict should be granted:

> When a Motion for Judgment Entered in Accordance with a Motion for Directed Verdict is filed, the test which the Court is to apply is the same as that applied to Motions for Directed Verdict. That is, the Court must take the strongest legitimate view of evidence in favor of the Plaintiff, indulging in all reasonable inferences in his favor and disregard any evidence to the contrary. The Trial Judge's action in granting a Motion for Judgment in Accordance with a Motion for Directed Verdict may only be sustained where the evidence is uncontradicted and reasonable minds could draw only one conclusion. *Bowers vs. Potts*, 615 [617] S.W.2d 149 (Tenn.App.1981). If any material evidence is conflicting or may support varying conclusions, the motion cannot be granted.

■ Mrs. Hicks points out a number of facts from which she insists the jury might

reasonably find the Bank had waived enforcement of the suretyship agreement signed by her.

(1) Acceptance without protest of guaranty enclosed with Mr. Hicks' letter of July 15, 1981, which was only signed by Mr. Hicks, although a line was provided for Mrs. Hicks' signature.

(2) Requiring through the years personal financial statements of Mr. Hicks, but not requiring them of Mrs. Hicks.

(3) Loan file reflecting in various memoranda Hicks & Associates loan was secured by a guaranty of Mr. Hicks, but not mentioning one for Mrs. Hicks.

On the other hand, there is proof from one of the officials of Sovran that he knew Mr. Hicks had transferred all of his assets to Mrs. Hicks and would never have made the loan without her guaranty. His proof in this regard is buttressed by a memorandum in the file bearing date of November 25, 1986, which states the following:

> This line has been in place for Hicks and Associates since 1977. It was originally a $40,000 line until 1983, when it was increased to $50,000. Richard and his son are the only agents with the company now. Revenues were $200,875 at year end 1985 and are projected to be the same at year end 1986. However, Mr. Hicks believes expense cutting measures in personnel and overhead should enable the company to become profitable again in 1987 after the losses in 2 prior years. Although company performance has been marginal and Mr. Hicks' personal worth lends little additional financial strength, Joyce Hicks' suretyship for $40,000, which is still being maintained, does provide additional security for this credit. Hicks and Associates also continues to maintain their depository relationship with us.

Additionally, a Bank official testified that when suretyship agreements are released this fact is noted on the face of the instrument and it is returned to the maker, as was the case as to three of the former associates of Hicks & Associates.

In *Knoxville Rod & Bearing v. Bettis Corp.*, 672 S.W.2d 203 (Tenn.App.1983), a fairly recent case by this Court, Judge Crawford addressed waiver as follows (at page 208):

In *Baird v. Fidelity-Phenix Fire Ins. Co.*, 178 Tenn. 653, 162 S.W.2d 384 (1942), our Supreme Court, quoting from a Massachusetts case, stated:

"Waiver is a voluntary relinquishment or renunciation of some right, a foregoing or giving up of some benefit or advantage, which, but for such waiver, he would have enjoyed. It may be proved by express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage; or by a course of acts and conduct, or by so neglecting and failing to act, as to induce a belief that it was his intention and purpose to waive."

178 Tenn. at 665, 162 S.W.2d at 389.

The acts or course of conduct referred to "must be clear, unequivocal and decisive acts of the party or an act which shows determination not to have the benefit intended in order to constitute a waiver." *Gitter v. Tennessee Farmers Mutual Insurance Company*, 60 Tenn. App. 698, 450 S.W.2d 780, 784 (1969).

While we should consider all of the evidence in a light most favorable to Mrs. Hicks, we must also consider any evidence adduced by the Bank which is not contradicted. Upon viewing the record in this light, we conclude that the act or course of conduct of the Bank does not meet the test of *Gitter*, and the Trial Court acted properly in granting the post-trial motion as to the original action.

■ As to Mrs. Hicks' second contention that the Bank had abandoned its guaranty by accepting a later one from Mr. Hicks, we note this issue was not presented to the jury and in the absence of a request by Mrs. Hicks for such an interrogatory we will deem the theory to have been waived.

■ The cross-complaint alleges the violation of and seeks relief under the following statutes relative to fraudulent transfers:

*66-3-305. Conveyances by insolvent without fair consideration declared fraudulent.*—Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration.

*66-3-306. Conveyances by persons in business in fraud of creditors.*—Every conveyance made without fair consideration, when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands, after the conveyance, is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business transaction without regard to his actual interest.

*66-3-307. Conveyances before debt incurred.*—Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

*66-3-308. Conveyances with intent to defraud.*—Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud, either present or future creditors, is fraudulent as to both present and future creditors.

*66-3-310. Remedies of creditor on matured debt.*—Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser:

(1) Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim; or

(2) Disregard the conveyance and attach or levy execution upon the property conveyed.

Apropos of the foregoing Code Sections, Mr. Hicks testified as follows:

### DIRECT EXAMINATION

Q  And did you transfer those assets solely into your wife's name?

A  Yes, I did.

Q  And why did you do that?

A  Well, there's only one reason. After what I had gone through with bankruptcy[3] with the former business that I had spent 13 years of my life, I did not want to see the amount of money that I had accumulated for the family to be lost because of actions of other people, and therefore, since she had no dealings with the business, I didn't want her to have to suffer if anything went wrong, and that was the reason I did it.

Q  When did you transfer those assets?

A  The majority of them were transferred in 1977, '78, and '79 when I started the business.

Q  Did you owe any creditors at that time?

A  No.

Q  Were you attempting to defraud your creditors?

A  No.

Q  Were you trying to hinder or delay your creditors?

A  Didn't have any.

Q  Did you owe Commerce Union Bank any money at that time?

A  No.

Q  You had a line of credit, but you didn't owe them any money, did you?

A  No.

Q  Did you have any intention at that time of borrowing any significant sums of money?

A  No, didn't need to.

Q  After you transferred those assets out of your joint names into her name, did that make you insolvent? Did that make you without enough assets to pay your debts?

A  No, because the agency, Hicks and Associates of which I was a stockholder, was making money at the time and I was not in a position where I had a financial problem.

Q  How did your business do from '77 through, say, '83, '84?

A  It did I would say all right. I mean, it was nothing great, but I mean, we were making money.

Q  Did it continue to grow through those years?

A  Yes.

### CROSS–EXAMINATION

Q  Well, do you recall when I was asking you questions in a deposition that I asked you that the reason you transferred the assets was so you could protect those assets from the creditors of Hicks and Associates? Do you recall that?

A  That's correct.

    . . . .

Q  You recall me asking that question, why you transferred the assets from Hicks and Associates from yourself to Mrs. Hicks was to protect those assets from the creditors of Hicks and Associates and you answered, "That was the intent." Is that correct?

A  That's right.

It can readily be seen from the foregoing testimony that there is material evidence to support the jury's answers exonerating Mr. Hicks from violating the provisions of T.C.A. 66–3–305, 306 and 307.

■■■  As to Section T.C.A. 66–3–308, we are inclined to believe that as to future creditors the debt must be incurred within a reasonable time after the transfer. However that may be, we nevertheless find there is evidence to support the jury verdict that Mr. Hicks did not intend to defraud the Bank. We reach this conclusion because the proof shows that the Bank knew Mr. Hicks had transferred the majority of his assets to his wife prior to January 1980 when Mrs. Hicks signed the second guaran-

---

3.  Mr. Hicks is referring to his former employer, Caldwell and Associates.

ty which of course was prior to its lending the additional $10,000 over and above Mrs. Hicks' guaranty, and even prior to its increasing the line of credit from $40,000 to $50,000.

Moreover, case law dictates that transfers may not be set aside unless prejudice results to the party seeking relief. *Marsh v. Galbraith*, 31 Tenn.App. 482, 216 S.W.2d 968 (1948). In light of our foregoing determination the Bank obviously has not been prejudiced as to $40,000 of its indebtedness, and it is arguable that the Bank has not been prejudiced as to the balance, because it had full knowledge of the transfers and could have protected itself by the simple expediency of having Mrs. Hicks sign a guaranty in the amount of $50,000.

As to the Bank's second issue, we find nothing in the record to support its assertion that "the Trial Judge, in his opinion, made it abundantly clear that as the 13th juror he did not agree with any part of the verdict of the jury," insofar as it relates to the counter-complaint. The reference to the transcript was at the conclusion of the proof and before the jury was charged or rendered its verdict.

Moreover, even if the Trial Judge had reservations relative to the jury verdict when it was returned, upon reflection he might very well have resolved his reservations. In any event he declined to disturb the jury verdict from which we may infer an approval absent evidence in the record to the contrary.

For the foregoing reason the Trial Court is affirmed and the cause remanded for collection of costs below. Costs of appeal are adjudged one-half to Mrs. Hicks and one-half to the Bank.

McMURRAY, J., and WILLIAM H. INMAN, Special Judge, concur.