# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 1, 2000 Session

## BETTY L. JOHNSON, ET AL. v.
## CHARLES S. SETTLE, M.D., ET AL.

### Appeal from the Circuit Court for Davidson County
### No. 96C-2598    Thomas Brothers, Judge

### No. M1999-01237-COA-R3-CV - Filed June 1, 2001

This is an appeal of a jury verdict based on personal injuries plaintiff received as a result of the wrong acetic acid solution being applied during a colposcopy. Metro Medical Supply, Inc., the supplier of the acid, appeals the trial court's decisions on post trial motions and the amount of the remittitur. Among other grounds, Metro Medical asserts that it is not liable because any acts or omissions on its part were too remote and that there were intervening superceding causes that were the legal and proximate cause of plaintiff's injuries. We agree, and for the reasons below, we find that Metro Medical was not legally liable to plaintiffs and any negligence on its part was superceded by unforeseeable intervening causes. Accordingly, the judgment against Metro Medical Supply, Inc. is reversed.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
### Reversed and Remanded

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM B. CAIN, J., joined.

David L. Steed, Jay N. Chamness, Thomas A. Wiseman III, Henry Hine, Keith Jordan, Nashville, Tennessee, for the appellants, Charles S. Settle, M.D., Miller Medical Group, P.C., Debra Sanders, Baptist Healthcare Group and Metro Medical Supply, Inc.

Daniel L. Clayton, Nashville, Tennessee, Steven R. Walker, Memphis, Tennessee, for the appellees, Betty L. Johnson and William T. Johnson.

**OPINION**

This case arises from personal injuries Mrs. Johnson received while undergoing a medical procedure known as a colposcopy on February 7, 1996. The colposcopy was performed at Miller Medical Group by Dr. Charles Settle. Assisting Dr. Settle was an employee of Baptist Healthcare Group, Debra Sanders, who prepared the tray for use by the doctor in performing the procedure. The procedure involved swabbing the cervix and vaginal vault with a 4% acetic acid compound. Ms. Sanders had prepared the tray using, by mistake, glacial acetic acid, a 99% acid concentrate. The acid had been supplied by Metro Medical Supply, Inc.

Mrs. Johnson suffered serious burns and other physical and psychological injuries as a result of the application of the glacial acetic acid. She and her husband sued Miller Medical Group, Dr. Settle, Baptist Healthcare Group, and Metro Medical Supply. After a jury trial, the jury found all defendants liable and assigned fault as follows: Miller Medical Group, P.C./Charles Settle, M.D. - 25%; Baptist Healthcare, P.C. - 60%; and Metro Medical Supply, Inc. - 15%. The jury then awarded damages to Mrs. Johnson totaling $2,507,811.74 and damages to Mr. Johnson totaling $150,000.00 for loss of consortium. The trial court suggested a remittitur to the damages awarded to Mrs. Johnson reducing that award to $1,757,811.74, and the plaintiffs accepted.

Although all defendants originally appealed, the appeal was dismissed as to all claims by Mr. and Mrs. Johnson against all defendants except Metro Medical Supply, Inc., who has appealed on the basis that any negligence by its employees was remote, or was superceded by negligence of others, so that, as a matter of law, no liability can be imposed upon it.[1]

I.

During the trial, Metro Medical Supply moved for a directed verdict at the close of the plaintiffs' proof and at the close of all the proof. After trial, it moved for judgment notwithstanding the verdict. All those motions were denied, and the denial of the last is the order on appeal. The applicable standard of review in determining whether a trial court should grant a judgment notwithstanding the verdict is the same standard used in determining whether a directed verdict should be granted. *Hicks v. Sovran Bank/Chattanooga*, 812 S.W.2d 296, 299 (Tenn. Ct. App.1991). The standard of review for a motion for directed verdict is well settled:

> A directed verdict is appropriate only when the evidence is susceptible to but one conclusion. We must 'take the strongest legitimate view of the evidence favoring the opponent of the motion when called upon to determine whether a trial court should have granted a directed verdict.' In addition, all reasonable inferences in favor of the opponent of the motion must be allowed and all evidence contrary to the opponent's position must be disregarded. As this Court has stated, 'The court may grant the motion only if, after assessing the evidence according to the foregoing standards, it

---

[1]Metro Medical Supply raised other issues which need not be discussed in view of our decision.

2

determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence.'

*Alexander v. Armentrout*, 24 S.W.3d 267, 271 (Tenn. 2000) (citations omitted).

The plaintiffs argue that we should apply the "material evidence" standard to the jury's verdict that Metro Medical Supply was responsible for 15% of the fault for Mrs. Johnson's injuries. "Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Tenn. R. App. P. 13(d). In *Alexander v. Armentrout*, our Supreme Court has recently discussed the interplay between the standard of review for directed verdict and the material evidence rule. In that case, the Court determined that the Court of Appeals had correctly stated the applicable standard of review for a motion for directed verdict, as set out above, but had misapplied the standard when evaluating the evidence. 24 S.W.2d at 271. The error on the part of the intermediate court was engaging in a *de novo* review of the evidence "in that it appears to have disregarded the jury's findings and to have reevaluated the evidence in its entirety." *Id*.; *see also Williams v. Brown*, 860 S.W.2d 854, 857 (Tenn. 1993) (on review of the grant of a directed verdict, it is not the office of an appellate court to weigh the evidence.) In *Armentrout*, the Supreme Court then proceeded to examine the sufficiency of the evidence in the record to support the jury's specific factual findings, reflected in a special verdict form, and found, under the "no material evidence rule," that there was evidence to support those findings. 24 S.W.2d at 271, 272. Those findings of fact determined the legal issues involved, and the Court affirmed the trial court's denial of directed verdict. *Id*. at 274.

## II.

On the jury verdict form the jury answered affirmatively the following questions with respect to Metro Medical Supply:

1. Was Metro Medical Supply, Inc. negligent?
2. If your answer is "Yes," was that negligence a legal cause of injury or damage to the plaintiff which would not otherwise have occurred?

Plaintiffs proceeded against Metro Medical Supply on the theory that it was negligent for supplying the incorrect strength of acetic acid in response to an order by Ms. Sanders and/or Baptist Healthcare Group. Specifically, plaintiffs alleged that Metro Medical negligently failed to take appropriate precautions to insure the correct strength of acetic acid was supplied; negligently failed to check the label of the bottle which contained the acetic acid, to determine whether it was the correct solution and concentration; and negligently filled the order in question.

These allegations, and the jury's determination that Metro Medical Supply was negligent, rest on the assumption that a 4% acetic acid compound had been ordered. On appeal, Metro Medical Supply argues facts which attempt to put into question whether the 4% solution was actually ordered from Metro Medical Supply. The jury has determined any factual issues regarding the filling of the

3

order and has implicitly determined that a 4% solution was ordered. Our task, per *Armentrout*, is simply to determine if any material evidence supports these findings.

The sealed and labeled bottle which was delivered contained glacial acetic acid, a 99% acid concentrate. Glacial acetic acid is highly concentrated and bears a pungent odor that is 20 to 25 times stronger than a 4% acetic acid solution. Glacial acetic acid is used in the practice of medicine to treat corns and viral warts, but undisputedly is inappropriate for a colposcopy. On the other hand, a 4% acetic acid solution is equivalent to household vinegar and is routinely used in the procedure.

Metro Medical Supply is an incorporated medical supplier who sells pharmaceutical supplies only to health care providers. It does not sell directly to consumers and does not sell compounded products or solutions. During the relevant time frame, orders for pharmaceutical supplies to be used at Miller Medical had to be placed through the purchasing department of Baptist Healthcare Group. The two entities regularly did business with each other and had developed routine practices.

On November 14, 1995, Ms. Sanders (an employee of Baptist Healthcare Group, but located at Miller Medical assisting the doctor) forwarded an order which included, among other items, "acetic acid, 4%, 500 milliliters, at three each" to Baptist Healthcare Group. Keith Brady, a purchasing agent at that entity, forwarded the order to Metro Medical Supply. Mr. Brady did not specifically remember whether he faxed the order or telephoned it in, as it was common for him to use either method. Had he telephoned it in, he testified, he would have read the order exactly. Mr. Brady did not know the difference between glacial acetic acid and a 4% solution of acetic acid.

Paula Mitchell at Metro Medical Supply, Inc. received the order and placed it into the company's computer system. She also had no specific recollection as to whether the order in question was received by fax or telephone, and the paperwork which might have disclosed that fact had been routinely discarded prior to the date of Mrs. Johnson's injury.

The order placed in Metro Medical Supply's system was for acetic acid. Ms. Mitchell was aware there was a difference between a 4% solution of acetic acid and glacial acetic acid, knew both were used by medical practitioners, but was unaware of their specific uses. She had seen orders for both come into Metro Medical Supply, but testified such orders would have been handled differently. Metro Medical Supply, Inc., was not licensed to compound pharmaceuticals and, therefore, could not provide the 4% solution. If a customer ordered the 4% solution, Ms. Mitchell would either direct the customer to a related company which had a pharmacy license, Metro Medical Pharmacy, or would herself fax the order directly to the Pharmacy. She did neither in this case because she entered the order as "acetic acid."

Mr. Brady came to Metro Medical Supply, Inc. and picked up the order. He inspected the items and checked the packing slip which said the order included "acetic acid 500 ML." He then delivered the product to Miller Medical Group.

Thus, the proof shows that Ms. Sanders ordered 4% acetic acid solution, but received glacial

4

acetic acid. The error occurred somewhere in Mr. Brady's transmission of the order or Ms. Mitchell's conversion of the order as she entered it in Metro Medical's computer system. There is material evidence to support the jury's finding that Metro Medical Supply, Inc. filled the order incorrectly and, therefore, was negligent.

The events occurring after Metro Medical Supply gave the glacial acetic acid to Keith Brady are relevant to the issues of causation and involve acts and omissions by persons unassociated with Metro Medical Supply. Metro Medical Supply provided three bottles of glacial acetic acid in conformity with the packing slip they also provided. The acid was contained in a cylindrical glass bottle and contained a large manufacturer's label on the front and back. The top of the label indicated in large letters that the bottle contained "Acetic Acid, Glacial" and included a detailed "actual analysis" of its contents, including notice that it was 99.9% acid. The label included warnings of "DANGER!" and "Combustible, Causes Severe Burns."

Mr. Brady inspected and picked up the order, signed the packing slip, and delivered the items to Miller Medical. He did not, before delivery, compare the packing slip with the purchase order. He did not know the difference between glacial acetic acid and a 4% acetic acid solution. The routine business practice would involve "matching up" the packing slip and the purchase order, including comparing them to see if anything was back ordered. Although he did not remember when he did it, Mr. Brady matched the documents up for filing and compared the two. He did not notice that one document said 4% acetic acid and the other said simply acetic acid. Under the normal practice in effect at that time, if the person at Miller Medical who had ordered a product received the wrong product, that person would notify Mr. Brady who would straighten things out with Metro Medical Supply. He received no such notification from anyone at Miller Medical about the order in question until the acid was used on Mrs. Johnson.

Mr. Brady delivered the three bottles of glacial acetic acid to Miller Medical, along with the packing slip. Although Ms. Sanders could not specifically remember whether she was the person who placed the bottles of acetic acid in the supply cabinet, she testified that typically she would put away items she had ordered. The acetic acid was stored with other products in the cabinet. Expert testimony was offered that glacial acetic acid, being highly concentrated,[2] is meant to be stored separately from other supplies. Other expert testimony established that supply shelves and cabinets need to be constantly monitored for expiration dates, rotating stock, and ensuring that the items in stock were appropriate. The three bottles of glacial acetic acid at issue here were received November 16, 1995 and remained unopened in the cabinet until one was opened to prepare the tray for the procedure on Mrs. Johnson.

Ms. Sanders was a medical assistant, licensed as a nurse technician, who had many years of experience. She had assisted in one or two colposcopies per day for about ten years prior to this one. She prepared the materials used by Dr. Settle for the procedure, including opening a sealed bottle

---

[2]In addition to its uses in medicine for removing corns and treating viral warts, it is also used to etch metals and can be utilized in photography.

5

of the acetic acid and pouring it into a small Dixie cup marked with the lettering "acetic." She also prepared three other solutions in a Dixie cup and 2 medicine cups and placed them on the tray for Dr. Settle. When asked if she read the bottle before opening it and pouring the solution into the cup, she responded, "No. I pulled just the bottle and saw acetic acid, which was my fault. I should have read it. I didn't. And – and I poured it in." When asked to clarify, she verified that she should have read the label and seen that it did not say 4%. Later, she also testified:

> Q: Have you ever denied that – denied to anybody that that was your responsibility [looking at the bottle before pouring it into the cup]?
> A: No.

An expert in nursing practices testified that when pharmaceuticals are delivered to a clinical office, they should be verified by trained personnel who would be familiar with the types of supplies ordered and their uses. She further testified that cabinets in a treatment room should be checked to, among other things, make sure no inappropriate products are there. Finally, she testified that the standard of care for nursing practice was not met when Ms. Sanders prepared the colposcopy tray because the glacial acetic acid bottle was clearly labeled as such and because the powerful odor of the glacial acid when the bottle was opened should have put the nurse technician on notice that it was the wrong product. That expert further testified that it is the responsibility of the person helping with the procedure to know the proper solution to be used.

When questioned about the bottles in which 4% acetic acid solution had been received in the past, Ms. Sanders testified that the bottles varied in shape and color. However, they had always had a pharmacy label from Metro Medical Pharmacy, and had always been labeled as a 4% solution. A "replica" of the type of bottle that the 4% solution commonly came in was introduced into evidence. It was lightweight plastic, and its footprint was square. The glacial acetic acid was in a cylindrical glass bottle.

### III.

To recover for personal injuries under a negligence theory, a plaintiff must prove "(1) a duty of care owed by the defendant to the plaintiff, (2) conduct by the defendant breaching that duty, (3) an injury or loss to the plaintiff, (4) causation in fact, and (5) proximate or legal cause." *McCall v. Wilder,* 913 S.W.2d 150, 153 (Tenn. 1995) (citations omitted). The determinative issues in this appeal involve the last two of those.

> Causation in fact refers to the cause and effect relationship that must be established between the defendant's conduct and the plaintiff's loss before liability for that particular loss will be imposed. On the other hand, legal cause connotes a policy decision by the judiciary to deny liability for otherwise actionable conduct. It requires the courts to establish the boundary of legal liability, using mixed considerations of logic, common sense, justice, policy, and precedent.

6

*Waste Management, Inc. v. South Central Bell Telephone Co.*, 15 S.W.3d 425, 430 (Tenn. Ct. App. 1997) (citations omitted). Our Supreme Court has explained the distinction between cause in fact and proximate or legal cause:

> The distinction between cause in fact and proximate, or legal, cause is not merely an exercise in semantics. The terms are not interchangeable. Although both cause in fact and proximate, or legal, cause are elements of negligence that the plaintiff must prove, they are very different concepts. Cause in fact refers to the cause and effect relationship between the defendant's tortious conduct and the plaintiff's injury or loss. Thus, cause in fact deals with the "but for" consequences of an act. The defendant's conduct is a cause of the event if the event would not have occurred but for that conduct. In contrast, proximate cause, or legal cause, concerns a determination of whether legal liability should be imposed where cause in fact has been established. Proximate or legal cause is a policy decision made by the legislature or the courts to deny liability for otherwise actionable conduct based on considerations of logic, common sense, policy, precedent and "our more or less inadequately expressed ideas of what justice demands or of what is administratively possible and convenient."

*White v. Lawrence*, 975 S.W.2d 525, 529 (Tenn. 1998) (quoting *Snyder v. Ltg. Lufttechnische GmbH*, 955 S.W.2d 252, 256 n. 6 (Tenn. 1997) (citations omitted)).

In the case before us, the jury answered yes to whether Metro Medical's negligence was "a legal cause of injury or damage to the plaintiff which would not otherwise have occurred?" In determining cause in fact, the jury's task is to determine whether the injury would still have occurred even if the conduct had never taken place. *Waste Management*, *Inc.*, 15 S.W.3d at 431. Applying the *Armentrout* standard, we conclude that there was material evidence in the record to support a finding that Metro Medical Supply's negligence in filling the order was a cause in fact of Mrs. Johnson's injuries.

However, for liability to be imposed, a defendant's acts or omissions that equate to a breach of duty owed to the plaintiff must be both the cause in fact and the legal cause of a plaintiff's injuries. Tennessee courts have developed a three-prong test for determining proximate or legal causation: "(1) the tortfeasor's conduct must have been a 'substantial factor' in bringing about the harm being complained of; (2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and (3) the harm giving rise to the action could have been reasonably foreseen or anticipated by a person of ordinary intelligence and prudence." *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991) (citations omitted).

Foreseeability is an essential element of causation and, therefore, of liability for negligence. "An injury that is the natural and probable consequence of an act of negligence is actionable, and such an act is the proximate cause of the injury. But an injury which could not have been foreseen

7

or reasonably anticipated as the probable result of an act of negligence is not actionable and such an act is either the remote cause, or no cause whatever, of the injury." *Linder Const. Co., Inc.*, 845 S.W.2d at 181 (citing *Ward v. Univ. of the South*, 209 Tenn. 412, 354 S.W.2d 246, 250 (1962), quoting *Moody v. Gulf Refining Co.*, 142 Tenn. 280, 218 S.W. 817 (1919)).

An injury may have more than one cause, and the relationship between separate acts which may have contributed to the injury is part of the proximate cause analysis.[3] Certainly, there is no requirement that all acts contributing to an injury be related. "[I]t is not necessary that tortfeasors or concurrent forces act in concert, or that there be a joint operation or a union of act or intent, in order for the negligence of each to be regarded as the proximate cause of the injuries, thereby rendering all tortfeasors liable." *Goodermote v. State,* 856 S.W.2d 715, 722 (Tenn. Ct. App. 1993) (quoting *McClenahan*, 806 S.W.2d at 775) (citations omitted). However, separate and distinct sequential acts by different defendants which may each meet the "but for" or "substantial factor" test of cause in fact may not all be found to be the legal cause of an injury. The chain of legal causation between the first negligent act and the eventual injury may be broken by a new, independent, intervening cause. *Waste Management, Inc. of Tennessee*, 15 S.W.3d at 432; *McClenahan*, 806 S.W.2d at 775. Courts have developed the intervening cause doctrine to apply in such situations as part of the legal causation analysis. Thus, the intervening cause doctrine has been called a common-law liability-shifting device. *Waste Management, Inc.*, 15 S.W.3d at 432. Simply stated, the doctrine provides "that a negligent actor will be relieved from liability when a new, independent and unforeseen cause intervenes to produce a result that could not have been foreseen." *Id.* (citations omitted).

> [A]n independent intervening cause breaks the chain of proximate causation and thereby precludes recovery. The law is equally clear, however, that '[a]n intervening act, which is a normal response created by negligence, is not a superseding, intervening cause so as to relieve the original wrongdoer of liability, provided the intervening act could have reasonably been foreseen and the conduct [of the original wrongdoer] was a substantial factor in bringing about the harm.' . . . Accordingly, 'an intervening act will not exculpate the original wrongdoer unless it is shown that the intervening act could not have been reasonably anticipated.'

*White v. Lawrence*, 975 S.W.2d at 529 (quoting *McClenahan*, 806 S.W.2d at 775).

---

[3]Where, for example, two separate and distinct causes, unrelated in operation, contribute to an injury, but one of them merely furnishes the condition making the injury possible, a longstanding rule of law would place sole responsibility for the injury on the later, direct cause. *Fly v. Cannon*, 836 S.W.2d 570, 574 (Tenn. Ct. App. 1992); *Underwood v. Waterslides of Mid-America, Inc.*, 823 S.W.2d 171, 180 (Tenn. Ct. App. 1991)(A defendant is not liable if he only furnishes the condition by which the injury is made possible and there is an intervention of a distinct and unrelated cause of the injury.) While the intact survival of this rule after the demise of joint and several liability and the resulting linkage of liability with fault in the aftermath of *McIntyre v. Ballentine*, 833 S.W.2d 52 (Tenn. 1992), is questionable, the related concept of intervening cause is undoubtedly still viable. *White v. Lawrence*, 975 S.W.2d at 529; *Waste Management, Inc.,* 15 S.W.3d at 429-30.

8

Thus, foreseeability is a necessary element of the analysis of both proximate cause and intervening cause.[4]

> The test of liability under the law of intervening cause requires a person to anticipate or foresee what usually will happen. It does not require him to anticipate and provide against what is unusual or unlikely to happen, or that which is remotely possible, but whether it was probable according to the usual experience of persons.

*Fly v. Cannon*, 836 S.W.2d 570, 574 (Tenn. Ct. App. 1992) (citations omitted).

Therefore, the appropriate question is whether the intervening negligent act could have been reasonably anticipated by the original negligent actor. In the case before us, the question is whether Metro Medical Supply could reasonably have foreseen that the medical professionals to whom it delivered a product, other than the one ordered, would use that product inappropriately. While there is testimony that employees of Metro Medical Supply knew the products they sold would be used in the treatment of patients, that knowledge is not sufficient to establish they should have anticipated improper use of a properly labeled product. There is evidence that glacial acetic acid is put to certain uses in the practice of medicine. The employees of Metro Medical Supply were not aware of the different medical uses of the two kinds of acid solution, were not required to be so informed, and, in any event, were not informed of the potential use of the product ordered by Miller Medical.

On the other hand, the staff at the doctor's office was so informed and was aware of the different uses for the two kinds of acid solutions. This heightened level of expertise is the basis of a defense available to manufacturers and sellers of medical products who provide adequate warning regarding the use of their products, the learned intermediary doctrine.

> Under this doctrine, manufacturers [or sellers] of certain medical products 'may reasonably rely on intermediaries to transmit their warnings and instructions.' This defense is based on the pivotal role that physicians play in the distribution of prescription products. Physicians can be learned intermediaries only when they receive adequate warnings. Thus manufacturers [or sellers] are not shielded from liability if they provide inadequate warnings to physicians.

> In order to recover for failure to warn under the learned intermediary doctrine, a plaintiff must show: (1) that the defendant failed to warn the physician of a risk associated with the use of the product not otherwise known to the physician; and (2) that the failure to warn the physician was both a cause in fact and proximate cause of the plaintiff's injury.

---

[4] Foreseeability is defined as "[t]he ability to see or know in advance; e.g. the reasonable anticipation that harm or injury is a likely result from certain acts or omissions. In tort law, the 'foreseeability' element of proximate cause is established by proof that actor, as person of ordinary intelligence and prudence, should reasonably have anticipated danger to others created by his negligent act. That which is objectively reasonable to expect, not merely what might conceivably occur." BLACK'S LAW DICTIONARY at 649 (6th ed. 1990) (citations omitted).

*King v. Danek Medical, Inc.*, 37 S.W.3d 429, 452 (Tenn. Ct. App. 2000) (citations omitted), *see also Laws v. Johnson*, 799 S.W.2d 249, 253 (Tenn. Ct. App. 1990) (holding seller may also use learned intermediary defense and that "the physician acts as a 'learned intermediary' between the manufacturer or seller and the patient.")  In addition, a supplier may not be liable for a failure to warn if the doctor has actual knowledge of the risks involved in using a product.

> '[T]he failure to warn cannot be the proximate cause of the user's injury if the user had actual knowledge of the hazards in question.'  Under this doctrine, physicians are the 'consumers' who must be warned.  Thus it is generally held that the learned intermediary doctrine may shield a manufacturer from liability when the physician was independently aware of the risks involved.

*Harden v. Danek Medical, Inc.*, 985 S.W.2d 449, 451 (Tenn. Ct. App. 1998) (citations omitted).

The doctrine applies to direct use by physicians as well as their prescribed use by patients.  Although the learned intermediary doctrine may not be directly applicable here, because the claim against Metro Medical Supply is not based on a failure to warn, we think it provides important principles related to whether Metro Medical Supply could have reasonably foreseen the negligent, incorrect use of a product which was clearly and appropriately labeled.  The label correctly identified the product as glacial acetic acid, it clearly stated the contents were 99.9% acetic acid, and it warned that the product causes burns.

IV.

Causation, including proximate or legal cause, is generally a question for the jury.  Similarly, the question of whether an intervening act which would break the causal chain has been shown is also generally for the jury to determine.  The exception, however, is where the uncontroverted facts, and inferences to be drawn from those facts, make the answer to the question so clear that all reasonable persons must agree on the outcome.  *White v. Lawrence*, 975 S.W.2d at 529-30; *Haynes v. Hamilton County*, 883 S.W.2d 606, 612 (Tenn. 1994) (citing *McClenahan*, 806 S.W.2d at 775).

We are of the opinion that this case falls within that exception.  Metro Medical Supply could not have reasonably anticipated, even if it delivered a product different from the one ordered, that no one involved in placing the order or receiving the delivery would have failed to notice the difference; that the staff at a medical office, presumed to be aware of the importance of accuracy in the use of medical products, would fail to take measures to ensure the correct product was received and stored; or that medical personnel would open and pour from a properly labeled bottle without checking the contents.  In other words, it was not reasonably foreseeable that sending a product used in the medicinal treatment of viral warts or corns would be used by a physician or his staff in a manner inconsistent with the intended purpose and in contradiction to the warning labels contained directly on the bottle.  It was not reasonably foreseeable that medical personnel would apply a product labeled "99.9% acetic acid," "Danger!" and "causes severe burning" directly to a patient's genital area.

10

We find that only one conclusion is reasonable: that the act of Metro Medical in supplying an adequately labeled and distinct bottle of acetic acid was not the proximate or legal cause of Mrs. Johnson's injuries. These unforeseeable intervening negligent acts of others broke the chain of causation and preclude a finding of liability against Metro Medical.

## V.

For the reasons stated herein, we find that the defendant, Metro Medical Supply, is not liable to plaintiffs because any acts or omissions on its part were not the proximate or legal cause of plaintiff's injuries and that, because reasonable minds could not differ on that conclusion, Metro Medical Supply's motion for a judgment notwithstanding the verdict should have been granted. Therefore, we reverse the trial court's denial of the motion for judgment notwithstanding the verdict and remand to the trial court for further actions, as needed, consistent with this opinion.

Our record includes a "Joint Notice of Settlement," filed after briefs were submitted by all parties to the trial court proceeding, but before oral argument, notifying this court that the plaintiffs had agreed to a compromise and settlement with Miller Medical Group, P.C., Charles L. Settle, Baptist Healthcare Group, and Debra Sanders (who had been previously nonsuited). On the basis of this notice, we entered an order dismissing those defendants from this appeal. Because this notice was filed at the time when all parties were aware of the status and nature of the appeal, we assume that all issues between the named parties have been settled and that further proceedings are precluded.

Costs of this appeal are taxed to the plaintiffs, for which execution may issue, if necessary.

_____
PATRICIA COTTRELL, JUDGE

11